# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERIA, <br><br> Plaintiff, <br><br> v. <br><br> HOWARD KAPLAN (1), STEPHEN KAPLAN (2), and ERIC KAPLAN (3), <br><br> Defendant. | Case No.: 15cr651-CAB <br><br> **ORDER ON MOTION FOR RESTITUTION [Doc. No. 92]** |

On May 1, 2017, the Court heard the United States' Amended Motion for Order of Restitution in the above-captioned case. [Doc. No. 92.] The motion arises out of the guilty pleas entered by co-defendants Howard Kaplan, Stephen Kaplan and Eric Kaplan on March 16, 2015, to one count of conspiracy to commit wire fraud, under 18 U.S.C. § 371. [Doc. Nos. 7, 12 and 17.] The co-defendants were sentenced on January 7, 2016, however at that time the matter of restitution was deferred to a later date at the joint request of the parties. [Doc. Nos. 67-69.] It is now sixteen months later and the issue of restitution still remains unresolved.

**I.    Background**

The following summary comes from the factual bases of the co-defendants' plea agreements. [Doc. Nos. 7, 12 and 17, ¶¶ B.1-10.] Beginning in or about 2001, and

1

continuing to sometime in 2010, Equity Based Services ("EBS") and its affiliates offered investment opportunities involving primarily the purchase and operation of self-storage facilities. EBS would enter into purchase agreements to buy self-storage facilities, and then seek investors through property syndication and/or 1031 exchanges. At the relevant times, defendant Howard Kaplan and his two sons, defendants Stephen and Eric Kaplan, were involved in the operation of EBS.

Between 2001 and 2010, EBS syndicated approximately 77 self-storage projects. Investors in the various EBS syndicated self-storage projects were induced in part to invest by a representation that investors would be entitled to a "Preferred Return," usually in the amount of 8% per annum, that would generally be paid on a monthly, quarterly or other periodic basis, and if not paid would accrue until the property was sold. From approximately 2002 through August 2010, EBS regularly distributed the periodic payments of the Preferred Return to investors. Based in part on the prompt and regular payment of the Preferred Return, many earlier investors invested in one or more subsequent projects. These prompt and regular payments of the Preferred Return also helped attract new investors to EBS syndications.

Beginning in or about 2006, some of the periodic payments of the 8% Preferred Returns received by investors in several of the projects were able to be made only by defendant Howard Kaplan's diversion of funds from better-performing properties ("lending projects") to under-performing ones ("borrowing projects"), or by the use of fees paid to EBS that were generated by new project syndications. In addition, Howard Kaplan sometimes used these funds to pay the borrowing projects' debt service and/or operating costs.

Howard Kaplan did not disclose to individual investors that their 8% Preferred Return distributions were often made despite the fact that their specific investment project was not generating enough operational profit to support the payment of an 8% Preferred Return or was, in fact, not generating sufficient funds to pay all operational

2

costs and debt service. Howard Kaplan also failed to disclose to investors his commingling of funds and use of investor funds to pay borrowing projects' debt.

Howard Kaplan further breached his fiduciary responsibility and duty to investors by: a) pre-funding Preferred Returns through a process of raising excess funds for individual projects; b) inducing investors to invest additional funds in projects without informing these investors as to the true financial condition of the properties; and c) creating new and sometimes undisclosed fees called "capital assignment considerations" and "equity consulting fees," including with respect to the acquisition of the AMS I Atlanta storage project.

By no later than January 2010, Howard Kaplan had informed his sons, Stephen and Eric Kaplan of his misconduct. Despite this knowledge, Stephen and Eric allowed other individuals to invest in new EBS syndicated projects without disclosing Howard Kaplan's prior activities. [Doc. Nos. 7 and 12, ¶9.] This was not a sophisticated scheme or complicated fraud, according to Assistant U.S. Attorney Phil Halpern. Howard Kaplan "simply borrowed from one project to pay another." [PSR, Doc. No. 37, ¶ 23.]

By 2015, when the defendants were charged in this case, many of the EBS investors had lost money in their syndication projects. Recognizing intervening economic causes, the Government acknowledged the difficulty to accurately identify the number of "victims" and the losses attributable to the defendants' criminal actions. [United States Sentencing Memorandum, Doc. No. 49, at 6-7 ("Victims maintain that the losses are approximately $60 million. However, the Government concedes that the $60 million figure is an overstatement based on what could be proved.").] The Government described the defendants' syndicated deals as "solid and lucrative," and acknowledged that one of the main reasons they started to fail was due to the economy, not because of any fraudulent activity. [PSR, Doc. No. 37, ¶ 23.]

Even now a portion of the properties remain profitable and still make money, while others went into foreclosure when the market crashed and the whole financial infrastructure became "overly stressed." [Id., ¶ 19.] At the time of sentencing the

3

government conceded that the exact amount of potential loss or gain is "convoluted." [Id., ¶ 20.] "Determining the actual number of victims was not a simple process since the money was lost due to the real estate crash." [Id., ¶ 23.] Although the parties agreed the defendants would be subject to an award of restitution, there was no agreement as to the amount that could be causally linked to the fraudulent activity of which the defendants were convicted.

## II. The Motion for Restitution

At the January 7, 2016 sentencing hearing, the Court set the restitution hearing for April 6, 2016. [Doc. Nos. 67-69.] On March 16, 2016, the parties jointly filed a motion to continue the hearing to June 2, 2016. [Doc. No. 75.] On May 6, 2016, the day after the Government's opening brief on restitution was due, the parties again requested to continue the hearing to October 19, 2016.[1] [Doc. No. 80.]

The Government filed its initial Motion for Order of Restitution on September 21, 2016. [Doc. No. 85.] The motion sets forth the acts that constituted the conspiracy.[2] [Id., at 3-5.] Notwithstanding the multiple descriptions of the fraudulent activity, in essence the scope of the fraud remained, as defined in the plea agreements, the borrowing of money by Howard Kaplan starting in 2006 from one project to pay the investors or expenses in another, and the failure of the defendants jointly after January 2010 to

---

[1] The reason provided in the May 6, 2016 motion for this second continuance was the unavailability of a "critical witness" on June 2, 2016 for the hearing. [Doc. No. 80, at 2.] This however did not explain the Government's failure to file an opening brief on May 5, 2016, in compliance with the Court's prior order, or why the briefing schedule needed to be continued out to late September, or why the hearing date could not just be adjusted to accommodate the "critical witness." The Court therefore concluded that the Government was just not ready to proceed.

[2] The Government stated in this initial restitution motion the acts that constitute the conspiracy to defraud investors are "set forth in detail in the United States' sentencing memorandum." [Doc. No. 85, at 3.] The Court notes, however, that the Government's sentencing memorandum simply recited the factual bases of the defendants' plea agreements with no further detail. The restitution claims based on described "self-dealing" exemplified by a Colorado land sale that appear in the restitution motion [id., at 4] were not part of the factual basis of any pleas or set forth at all (much less in detail) in the Government's sentencing memorandum.

4

disclose that activity to current and prospective investors to enable them to obtain further financing.

Directly contradicting its prior representation at the time of sentencing that the scheme was neither sophisticated nor complicated and that the $60 million losses asserted by the victims was an overstatement of what could be proved, the Government in the initial restitution motion described the scheme as "complicated," and maintained the victims were in the "best position to estimate the losses." [Id., at 7.] The Government submitted a restitution demand of $60,006,000 prepared by the investors, and an alternative demand of $56,006,000 that excluded "certain amounts the Government has deemed not allowable." [Id., at 9; Doc No. 85-1, Appendix A & B.] The restitution claim consisted primarily of a list of EBS properties that were eventually foreclosed on, went bankrupt, were sold at a loss, or were underwater. The Government requested a five-day hearing at which it would presumably establish that the investments in these failing properties were lost as a direct result of the defendants' criminal conduct, and not as previously represented due mainly to intervening economic causes.

Following service of the Government's opening motion for restitution, the parties again jointly moved to vacate the hearing date and requested a status conference. At a conference held on October 19, 2016, the parties requested time to negotiate, and ultimately on November 18, 2016, the Court directed the Government to file an amended motion for restitution by December 23, 2016. [Doc. No. 91.]

On December 23, 2016, the Government filed an Amended Motion for Order of Restitution. [Doc. No. 92.] The motion included a revised and reduced restitution demand of $17,609,162 against Howard Kaplan and $3,764,156 against the three defendants jointly. [Doc. No. 92-1, Exs. 1 &2.] This revised demand included transactions not previously identified by the Government as part of the criminal conduct or within the scope of the described fraudulent activity.

The briefing and hearing on this revised motion was continued twice at the joint request of the parties. [Doc. Nos. 95, 100.] Defendants filed responsive briefs on March

5

27, 2017. [Doc. Nos. 105-107.] Government filed its reply brief on April 17, 2017. [Doc. No. 112.] At the hearing held on May 1, 2017, the Government sought the Court's guidance as to the activities of the defendants that could properly be considered within the offense of conviction.

### III. Legal Standards

The offense of conviction, a conspiracy to commit fraud, is subject to the Mandatory Victims Restitution Act ("MVRA"). 18 U.S.C. § 3663A(c)(1)(A)(ii) ("This section shall apply in all sentencing proceedings for conviction of, or plea agreements relating to charges for any offense–that is an offense against property under this title, . . . , including any offense committed by fraud or deceit). The Court is required to order restitution to victims of offenses against property "in which an identifiable victim has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). A "victim" is a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered. 18 U.S.C. § 3663A(a)(2).

Under the MVRA if someone is convicted of a conspiracy, the court can order restitution for damage resulting from any conduct that was part of the conspiracy and not just from specific conduct that met the overt act requirement of the conspiracy. *United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir. 1996). However the court should exclude injuries caused by offenses that are not part of the conspiracy of which the defendant has been convicted. *United States v. Elson,* 577 F.3d 713, 723 (6th Cir. 2009).

Where convictions are the result of guilty pleas, the court should consider the plea agreement, the plea colloquy, and other statements made by the parties to determine the scope of the offense of conviction for the purposes of restitution. *Id.; United States v. Cothran*, 302 F.3d 279,290 (5th Cir. 2002) (where a defendant is convicted after pleading guilty, a court may consider a plea agreement when defining the scope of a fraudulent scheme and amount of restitution.)

Under the MVRA, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the

economic circumstances of the defendant. 18 U.S.C. § 3664(f)(1)(A). Any alternative availability of recovery through a civil lawsuit is irrelevant in determining restitution under the MVRA. 18 U.S.C. § 3664(f)(1)(B); see also *United States v. Cienfuegos*, 462 F.3d 1160, 1168 (9th Cir. 2006) ("under the MVRA the availability of a civil suit can no longer be considered by the district court in deciding the amount of restitution").

It is the government's burden to prove the amount of loss for restitution purposes by a preponderance of the evidence. 18 U.S.C. § 3664(e). The government must also show by a preponderance of the evidence that an individual is a victim of a crime of which the defendant was convicted, and that the victim's losses were caused by the defendant's offense conduct. *United States v. Gossi*, 608 F.3d 574, 579 (9th Cir. 2010). The government is not required prove the amount of loss with precision, a reasonable estimate may be the basis of an award. Restitution is awarded with the view toward achieving fairness to the victim. *See United States v. Gordon*, 393 F.3d 1044, 1060 (9th Cir. 2004) (the restitution process should be expedient and reasonable, with courts resolving uncertainties with a view toward achieving fairness to the victim.)

An order of restitution however may only compensate victims "for actual losses caused by the defendant's criminal conduct." *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 926 (9th Cir. 2001). It is therefore not enough to show that but for the defendant's conduct the loss would not have occurred, the government must also demonstrate proximate causation. *Id.*, at 928, citing *United States v. Vaknin*, 112 F.3d 579, 590 (1st Cir. 1997) ("The government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally)."). Defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct. *See Gordon*, 393 F.3d at 1055. An intervening cause which is not directly related to the conduct of conviction may render the causal chain so attenuated that a restitution award becomes unreasonable. *See e.g.,*

*United States v. Ward*, 2013 WL 57855, *3-4 (Jan. 3, 2013 N.D. Cal.) (District court declined to award certain restitution claims in light of evidence that the real estate market downturn was an intervening cause of investor losses not attributable to defendants' criminal conduct.).

Finally, a court need not order restitution if it finds that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 366A(c)(3).

### IV. Discussion

**1. The Scope of the Fraudulent Scheme**

The defendants were charged in a single count information with conspiring between early 2010 and continuing up to and including August 2010, to withhold material information from investors regarding both the diversion of funds and the true financial status of the [EBS] properties in order to induce those investors to continue to make further investments in EBS syndications. [Doc. No. 1.] The defendants' convictions are the result of guilty pleas that mirror the scope of the conspiracy as described in the information. [Doc. Nos. 7, 12 and 17.] Where a defendant is convicted based on a guilty plea the scope of the underlying scheme is defined by the parties themselves through the plea negotiations and the plea agreement. *Elson*, 577 F.3d at 723, citing *United States v. Adams*, 363 F.3d 363, 367 (5th Cir. 2004).

The parties defined the fraud and the conspiracy in the plea agreement. Between January 2010 and August 2010, the defendants conspired to withhold from investors the material information that Howard Kaplan, since 2006, was commingling funds between the various syndicates to support the payment of Preferred Returns to investors in under-performing projects and cover the operational costs and services of those projects, that he raised excess investor funds to pay the Preferred Returns and debt on under-performing projects, and that he also created fees that were paid with investor funds without their knowledge.

After January 2010, in furtherance of the conspiracy, Stephen and Eric Kaplan allowed individuals to invest in EBS syndicated projects without disclosing Howard Kaplan's prior activities and the true financial condition of the projects.

At sentencing the Government summarized the scope of the fraud as an unsophisticated, uncomplicated scheme – Howard Kaplan "simply borrowed from one project to pay another." [PSR, Doc. No. 37, ¶ 23.] The fraud became a conspiracy when Howard Kaplan told Stephen and Eric of his conduct and they agreed to keep it from investors to obtain additional investments in EBS. This was "the mutual understanding of the parties regarding the offense of conviction" at the time of sentencing as reflected in the charging document, the negotiated plea agreement, the statements made in the presentence report and the Government's sentencing memorandum. *See Elson*, 577 F.3d at 723 (the plea negotiations and plea agreement define the scope of the underlying scheme.)

Each defendant's plea agreement provides that "the defendant agrees that the amount of restitution ordered by the Court shall include Defendant's total offense conduct, and is not limited to the count(s) of conviction." Based on the negotiations and admissions in the plea agreements, the Court finds the total offense conduct subject to restitution claims for each defendant is as follows:

For Howard Kaplan, losses proximately caused from 2006 to August 2010
by his fraudulent omissions or actions, as follows:

- Undisclosed use of funds from better-performing properties to pay distributions, operating costs and debt service for under-performing properties;
- Undisclosed use of investor funds to pay project debt and operating costs for under-performing properties;
- Undisclosed application of investor funds to "capital assignment considerations" and "equity consulting fees"; and

- The obtaining of funds from investors from 2006 to August 2010, without disclosing these actions and the true financial condition of the EBS properties.

For Stephen and Eric Kaplan, losses proximately caused as a result of their obtaining additional investment funds for new or ongoing properties from January 2010 to August 2010, without disclosing Howard Kaplan's activities and the true financial condition of the EBS properties, including losses attributable to any undisclosed application of funds to "capital assignment considerations" and "equity consulting fees" in that time period.

**2. Conduct Excluded from the Total Offense Conduct**

Government's amended motion for restitution identifies for the first time three transactions that it seeks to include in the scope of the fraud that was concealed by the conspiracy. These transactions presumably fall within the Government's generic description of "self-dealing" in the sale of properties between the Kaplan entities and various investor funds.[3] [Doc. No. 92, at 4, lines 12-17; Doc. No. 92-1 at 2.] These claims are excluded from the total offense conduct.

The scope of Howard Kaplan's fraudulent conduct that the parties agreed was concealed in furtherance of the conspiracy does not include transactions of Kaplan entities selling properties to the funds. There is nothing in the plea agreement that identifies these sales as fraudulent. There are no admissions that these transactions were improper "self-dealing." Even assuming these transactions were not legitimate transactions that resulted in identifiable losses to someone,[4] injuries caused by offenses that are not part of the conspiracy of which the defendant has been convicted are excluded. *Elson,* 577 F.3d at 723.

---

[3] The specific transactions identified as "Kaplan Interest purportedly sold to Fund III" are: the Barksdale property, $75,000; the Gilbert property, $280,848; and the Austin IV property, $150,000.
[4] Neither the Gilbert nor the Austin IV properties are identified in the amended restitution motion as failed properties resulting in a loss of some or part of the investment funds.

The Court also excludes the transaction involving the transfer of land parcels in Colorado Springs from the defendants to an EBS Fund in or about February 2010 [Doc. No. 92, at 4, lines 12-17; Doc. No. 92-1 at 2], as beyond the conduct underlying the offense of conviction. Again, although restitution may be ordered for damage resulting from conduct that was not identified as an overt act, it must be part of the action pursuant to the scheme. The fraudulent acts that define the scheme were set forth in the plea agreements and other submissions at the time of sentencing, and they do not include this transaction. Moreover, the Government has not disputed the defendants' representation that in plea negotiations the Government specifically agreed to exclude this transaction from the factual basis of the fraud.

"Plea agreements are contracts, and are 'premised on the notion that the negotiated guilty plea represents a bargained-for quid pro quo'." *United States v. Avery*, 719 F.3d 1080, 1084 (9th Cir. 2013) quoting *United States v. Escamilla*, 975 F.2d 568, 571 (9th Cir. 1992). The parties bargained for a plea that did not include this particular transaction, and the scope of the fraud as defined by the plea agreement does not encompass the transfer of land parcels by the Kaplans to various funds as part of the fraud.

The Government argues that its agreement in the plea negotiations to exclude this transaction from the description of Howard Kaplan's fraudulent conduct was not intended as an agreement to relinquish its right to recover funds from this transaction. The plea agreement could have, it argues, but does not state what the defendants now assert was their understanding of the negotiation, that this transaction was excluded for all purposes as part of the offense of conviction. [Doc. No. 112, at 7.]

Any ambiguity or lack of clarity regarding the intent of the parties when the plea was drafted is not construed against the defendants. *See Avery*, 719 F.3d at 1084 (ambiguities or inconsistencies are construed in favor of the defendant, and the government is responsible for any lack of clarity). The defendants contend that they expressly bargained for this transaction to be excluded from the scope of the fraud, and

therefore the admitted offense of conviction. If that was not the Government's intent, that lack of clarity in the negotiation is construed against the Government. The transaction is excluded.

### 3. Conduct Subject to Restitution

Losses identified in the Government's Amended Motion for an Order of Restitution that come within the scope of the offense of conviction are: the "assignment consideration fee" ($400,000) charged to investors in the Atlanta Property project (an overt act the defendants specifically admitted); the "acquisition fee" ($122,500) charged in the Barksdale project and the "assignment consideration fee" ($525,000) charged in the AMS Missouri City deal, if they were in fact undisclosed to investors. If these fees were undisclosed and acquired from investor funds obtained after January 2010, the defendants would be jointly and severally responsible. If the fees were acquired after 2006, but before the formation of the conspiracy, Howard Kaplan would be solely responsible.

The remaining loss identified in the Government's amended motion that is submitted as to all three defendants is the purchase price ($1,010,808) of the Barksdale project that subsequently went into foreclosure. The Government may proceed against the three defendants for losses to investors that were solicited after January 2010. With regard to the restitution claim made only against Howard Kaplan for losses of value in nine properties [Doc. No. 92-2 at 2], the Government may proceed on these claims against Howard Kaplan.

With regard these claims however, the Government must demonstrate by a preponderance of the evidence that the loss of the investors' funds made in these projects was caused by the defendants' conduct. In light of the Government's prior statement that losses and foreclosures of these properties were due to the economy, not because of any fraudulent activity, it will not be sufficient to simply assert that had investors known the truth of the financial status of EBS at the time they invested they would not have invested and therefore would not have lost some or all of their investment funds. *Gamma Tech.,*

265 F.3d at 928 ("The government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated").

Defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct. *See Gordon*, 393 F.3d at 1055. An intervening cause which is not directly related to the conduct of conviction may render the causal chain so attenuated that a restitution award becomes unreasonable.

In this case not all the individuals who invested in EBS properties after 2006 lost their investment funds. The Government admits that certain of the properties are still operating at a profit and making money. The defendants persuasively argue that investors cannot chose to be "victims" of a fraud and conspiracy only with regard to those EBS properties they invested in that subsequently failed, claiming their losses were proximately caused by the defendants' conduct. Some of the same individuals, subject to the same omissions and misrepresentations that form the offense of conviction, also invested in properties that did not fail. Consequently the causal nexus between the criminal conduct and the losses appears attenuated due to intervening causes, as the Government has previously conceded.

When the defendants agreed to and entered their pleas in March, 2015, and as late as the sentencing hearing in January, 2016, the Government was affirmatively representing that proving restitution in this case was complicated by the fact that losses of which the investors complained, were caused not by the admitted fraudulent activity and the conspiracy, but by intervening economic forces not caused by the defendants. [PSR, Doc. No. 37, ¶ 23 (one of the main reasons they started to fail was due to the economy, not because of any fraudulent activity).] That acknowledgement was part of the context to the defendants' decision to plea. The Government cannot simply abandon that concession and contend at this point that the defendants' conduct is the proximate cause

of the losses investors sustained in the properties listed in the amended schedule of restitution, without demonstrating that intervening causes were not also responsible.

### V. Conclusion

The completion of sentencing in this case has already been unduly protracted and delayed, due to the complexity of ascertaining a provable restitution award. Unless the parties can reach an agreement as to the award of restitution in this case, based on the determinations set forth in this order, the Court will hold a final hearing on restitution on **July 25, 2017** at **9:00 a.m.** in Courtroom 4C.

**IT IS SO ORDERED.**

Dated: June 22, 2017

Hon. Cathy Ann Bencivengo
United States District Judge